UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WALTER KRAFT,

                    Plaintiff,             Civil Action No. 18-11320
                                       Honorable Arthur J. Tarnow
                                        Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 15]

Plaintiff Walter Kraft ("Kraft") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Title II Social Security Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [11, 15], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

## I.    RECOMMENDATION

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Kraft is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [15] be GRANTED, Kraft's Motion for Summary Judgment [11] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision be AFFIRMED.

II.     **REPORT**

A.     **Procedural History**

On December 9, 2015[1], Kraft filed applications for DIB and SSI, alleging a disability onset date of March 1, 2012.  (Tr. 189-96).  He later amended his alleged onset date to July 2, 2014. (Tr. 40).[2]  These applications were denied initially on March 25, 2016.  (Tr. 103-36).  Kraft filed a timely request for an administrative hearing, which was held on December 5, 2016, before ALJ Therese Tobin.  (Tr. 32-62).  Kraft, who was represented by attorney Nicole Thompson, testified at the hearing, as did vocational expert Elizabeth Pasikowski.  (*Id.*).  On May 24, 2017, the ALJ issued a written decision finding that Kraft is not disabled.  (Tr. 15-27).  On February 27, 2018, the Appeals Council denied review.  (Tr. 1-5).  Kraft timely filed for judicial review of the final decision on April 27, 2018.  (Doc. #1).

B.     **Framework for Disability Determinations**

Under the Act, SSI and DIB are available only to those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

---

[1] The ALJ and both parties list Kraft's application date as November 2, 2015.  (Tr. 15, Doc. 11 at 8, Doc 15 at 4.) However, the administrative record containing a copy of Kraft's application shows a date of December 9, 2015.  Thus, the Court will defer to date on the application contained in the administrative record: December 9, 2015.

[2] Kraft previously filed an application for Social Security benefits, which another ALJ denied on July 1, 2014. (Tr. 40).  Thus, the earliest date he could be eligible under these applications is July 2, 2014.

42 U.S.C. §1382c(a)(3)(A) and 42 U.S.C. §423(d)(1)(A).   The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

## C.   Background

### 1.   *Kraft's Reports and Testimony*

At the time of the administrative hearing, Kraft was 47 years old, and at 5'11" tall, weighed 252-254 pounds.  (Tr. 40-41).  He lived in a home with his fiancée with her three children, as well as his five year old son.  (Tr. 41, 45).  Kraft completed tenth grade.  (Tr. 45).  Previously, he

3

worked as a truck driver, repair person, and auto mechanic.  (Tr. 36).  Kraft has not worked since March 1, 2012.  (Tr. 237).

Kraft alleges disability as a result of arthritic back and knee pain, recurrent abscesses, HIV, syphilis, depression, and diabetes.  (Tr. 236).  Kraft testified that he can stand for five minutes, and sit for ten to fifteen minutes before he needs to stand up and move around.  (Tr. 50).  He is able to drive, but not for long periods of time.  (Tr. 42).  He testified that he is not able to perform household tasks such as cooking because his back starts bothering him after standing for 10-15 minutes.  (Tr. 49).  He also needs help with bathing, dressing himself, clipping his toenails, and other personal care.  (Tr. 48).  He cannot bend, squat, or crawl without needing help getting back up, and cannot climb more than one or two stairs.  (Tr. 50).  He does not have difficulty reaching in front of him, but does have difficulty reaching overhead.  (Tr. 50-51.)  He does not have problems using his hands or fingers, nor does he have memory problems.  (Tr. 51.)  Kraft testified that the only way he can spend time with his five year old son is to sit, watch tv, or hold his son.  (Tr. 51).  He further testified that he spends 75% of the day in bed or lying down, experiences nausea which he treats with marijuana, and only sleeps a few hours at a time overnight.  (Tr. 51).

> 2.   *Medical Evidence*
>
> a.   *Physical Impairments*

Kraft has been diagnosed with cervical, thoracic, and lumbar degenerative disc disease, an HIV infection, osteoarthritis of both knees, diabetes, syphilis, peripheral neuropathy, peptic ulcers, osteoarthritis of the back, and abscesses.

Kraft's neck and back pain originated as early as April 2013, when he presented to Henry Ford Wyandotte Hospital with pain and was admitted for several days.  (Tr. 282, 311).  An MRI

showed mild to moderate stenosis L2-L3, degenerative changes, modic changes, and spondylosis.[3] (Tr. 307, 309).  At Henry Ford Wyandotte, he received joint injections with blocks for pain and showed improvement.  (Tr. 305).  At a follow-up appointment, he reported his pain "is getting better."  (Tr. 584).  Also in 2013, he was diagnosed with syphilis and HIV.  (Tr. 589).

In January 2015, he presented to the emergency department at Henry Ford Hospital complaining of a gluteal abscess.  (Tr. 333).  He was admitted due to his diabetic history, cellulitis, and sepsis.  (Tr. 337-38).  Afterward, he reported to a physician at a follow-up appointment that he was "fine and doing ok."  (Tr. 519).

He presented to Henry Ford Hospital again in June 2015 for right middle finger pain due to an abscess.  (Tr. 356, 358).  In early August 2015, he underwent a study of his cervical spine. (Tr. 553-55).  The results showed that his residual myelomalcia was "not significantly changed" since an August 2013 study; his T2 hyperintensive cord signal at C3-C4 was "improved" since May 2013; and his cervical and lumbar spine showed "improvement," "with only minimal progression of lumbar degenerative change."  (Tr. 555).

In late August 2015, he presented to Oakwood Hospital with chest pain.  (Tr. 415). Evaluation showed "no evidence of acute intrathoracic process.  No thoracic aortic injury," and his CT evaluation "otherwise unremarkable" and "normal aorta and nothing acute."  (Tr. 428, 436). Days later, he presented to Oakwood Heritage Hospital with reports of bilateral blurred vision, which his provider found to be "most likely related to his hyperglycemia."  (Tr. 460, 463).  At his follow up appointment, when given advice on diabetes management, he "got angry and left the clinic without examination."  (Tr. 531).

---

[3] The MRI was taken the day before at Oakwood Hospital, where he presented with the same symptoms and was admitted, but he left the hospital against medical advice.  (Tr. 283, 410).

In early September 2015, Kraft saw his doctor for routine HIV follow-up care.  (Tr. 531).
He reported he was, "[f]eeling well" and "100% compliant with his antiretroviral medication."
(Tr. 532).   His assessment was: "HIV disease, stable immune function and virologically
suppressed, compliant with current antiretroviral medication regimen."  (Tr. 533).

In October 2015, he arrived at Henry Ford Hospital for treatment for a gluteal abscess, and
was admitted.  (Tr. 360, 542, 549).  In regard to his HIV infection, he stated "he was diagnosed
about 4 year[s] ago and is compliant with his medication.  (Atripla)."  (Tr. 549).  After his abscess
procedure, he stated that he wished to leave the hospital against medical advice, stating he felt
"100% better and all I needed was to get cut open."  (Tr. 550).

On January 15, 2016, Kraft attended a regular visit with his provider.  (Tr. 561).  With
regard to his HIV infection, his "last CD4 count was 740."  (Tr. 564).  On August 15, 2016, he
attended a regular visit for his HIV infection and was concerned about the side effects of his
medication.  (Tr. 677).  The medical report states, "So, it was decided to switch to Trimeq.  But
when the patient received prescription he read the side-effect profile and was concerned about
taking triumeq.  Therefore he did not start taking triumeq.  He reports having Atripla and has been
compliant with the medications."  (*Id*.).  At that visit, his viral load was "undetectable and CD4 at
672.  (Tr. 679).

In September 2016, Kraft presented to Henry Ford emergency department for another
gluteal abscess.  (Tr. 679-82).  In October 2016, regarding his HIV, Kraft stated he has been
compliant with his therapy and denied missing any doses.  (Tr. 693).  He denied fever, chills, chest
pain, SOB, cough, abdominal pain, diarrhea, change in bowel and bladder habits. (*Id*.).

3.    *Vocational Expert's Testimony*

Elizabeth Pasikowski testified as an independent vocational expert ("VE") at the

administrative hearing.  (Tr. 55-61).  The ALJ asked the VE to imagine a hypothetical individual of Kraft's age, education, and work experience who can perform sedentary work with the following additional limitations:  stand and/or walk with normal breaks for a total of one hour in an eight-hour workday; sit for a total of seven hours in an eight-hour work day with normal breaks; avoid frequent ascending and descending of stairs; perform pushing/pulling motion with his upper and lower extremities within the aforementioned weight restrictions; perform all postural activities of occasionally climbing ramps, stairs, balancing, kneeling, crouching, and crawling.  (Tr. 57).  The VE testified that the hypothetical individual would not be capable of performing Kraft's past relevant work.  (*Id*.).  However, the VE further testified that the hypothetical individual would be capable of working in unskilled, sedentary jobs including inspector, sorter, or assembler.  (Tr. 91).

The ALJ then asked the VE to imagine a second hypothetical individual with the following changes and additions: occasionally climbing ramps and stairs; occasionally balancing and stooping; never kneeling, crouching, or crawling, never climbing ladders, ropes, or scaffolds; sit/stand option permitting change of position every fifteen minutes if needed and without disturbing the workplace. (Tr. 57-58). The VE testified that the hypothetical individual would not be capable of performing Kraft's past relevant work but maintained that the jobs of unskilled, sedentary inspector, sorter, or assembler still applied. (Tr. 58).

Next, the ALJ asked the VE a third hypothetical with the following additional limitations: inability to have persistence, pace, or concentration to perform simple, routine tasks on an eight-hour day/five-day a week/ 40 hours a week or equivalent basis; or that the individual would be off-task 20 percent of the time; or that the individual would be absent three or more days a month due to impairments.  (Tr. 58-59.)  The VE testified that the hypothetical individual would not be capable of performing Kraft's past relevant work but maintained that the jobs of unskilled,

sedentary inspector, sorter, or assembler still applied.  (*Id*.).

Finally, the ALJ asked the VE if adding the following mental limitations to hypothetical one or two would change the VE's decision regarding capability to perform the jobs of inspector, sorter, or assembler: that the individual be limited to perform simple, routine tasks, and that he/she use judgment limited to simple work-related decisions and deal with changes in the work setting limited to simple work-related decisions.  (Tr. 59).  Again, the VE testified that this would not change her opinion. (*Id*.).

After Kraft's counsel cross-examined the VE, the ALJ added a final limitation to the hypothetical: whether using an assistive device to ambulate would affect the available jobs. (Tr. 60).  Again, the VE testified that this would not change her opinion.  (*Id*.).

### D.      The ALJ's Findings

At Step One of the five-step sequential analysis, the ALJ found that Kraft has not engaged in substantial gainful activity since July 2, 2014 (the alleged onset date).  (Tr. 18).  At Step Two, the ALJ found that Kraft has the severe impairments of obesity, cervical degenerative disc disease, thoracic and lumbar degenerative disc disease, an HIV infection, osteoarthritis of the bilateral knees, diabetes mellitus, syphilis, peripheral neuropathy, peptic ulcers, osteoarthritis of the back, and abscesses.  (*Id*.).  At Step Three, she found that Kraft's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 19).

The ALJ then found that Kraft retains the residual functional capacity ("RFC") to perform sedentary work with the following additional limitations:  occasionally climb ramps and stairs; occasionally balance and stoop; but never kneel, crouch and crawl, climb ladders, ropes, or scaffolds.  He must also be allowed a sit/stand option allowing a change in position every 15 minutes as needed and without disturbing the workplace.  He must also be allowed use of an

assistive device to ambulate.  (Tr. 21).

At Step Four, the ALJ determined that Kraft is unable to perform his past relevant work. (Tr. 25).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Kraft is capable of performing a significant number of jobs that exist in the national economy.  (Tr. 25). As a result, the ALJ found that Kraft is not disabled under the Act.  (Tr. 26-27).

Kraft makes two arguments in his motion for summary judgment: (1) that the ALJ should have found that he meets the standard for a Listing level impairment under Listings 14.11 (HIV Infection) and 1.04 (Disorders of the Spine); and (2) that the ALJ's residual functional capacity assessment is inappropriate given his limitations.

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the

case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion'").

## F.   Analysis

### 1.   *The ALJ's Conclusion that Kraft Does Not Have a Listing Level Impairment is Supported by Substantial Evidence*

10

Kraft argues that the ALJ erred in finding at Step Three that his impairments do not meet or medically equal Listing 14.11 or 1.04, asserting that the ALJ "cites no medical opinion(s) in support of her conclusions." (Doc. #11 at 23). The Court disagrees.

Kraft bears the burden of proving that his impairments meet or medically equal a particular listing. *See Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §404.1525(a). In other words, a claimant who meets or medically equals the requirements of a listed impairment will be deemed conclusively disabled. *See Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165, at *2 (6th Cir. Apr. 1, 2011). "A claimant must satisfy all of the criteria to meet the listing." *Rabbers,* 582 F.3d at 653.

In this case, the ALJ found, in relevant part, that Kraft has the severe impairments of HIV infection and degenerative disc disease. (Tr. 20). She then went on at Step Three to consider whether these impairments, whether considered alone or in combination with other impairments, meet or medically equal a listed impairment, specifically Listings 14.11 and 1.04, respectively.

As to Listing 14.11, the ALJ explicitly considered whether Kraft's impairment satisfied the Listing's requirements:

> The claimant's impairments failed to meet the listing for 14.11, Human immunodeficiency virus (HIV) infection, because the record, consistent with the findings below, does not contain documentation as described in 14.00F and multicentric Castleman disease affecting multiple lymphoma, primary effusion lymphoma, progressive multifocal leukoencephalopathy, or pulmonary Kaposi sarcoma which is of listing level severity. Moreover, the record does not contain documentation described in 14.00F and an absolute CD4 count of 50 cells/mm³; a CD4 percentage of less than 14 percent, and one of the following 1. BMI measurement of less than 18.5; or 2. Hemoglobin measurement of less than 8.0 grams per deciliter (g/dL); or

> complication(s) of HIV infection requiring at least three hospitalizations within a 12-month period and at least 30 days apart as defined by the Listings.  Further, the record does not contain documentation as described in 14.00F and repeated manifestations of HIV infection, including those listed in 14.11A–H, but without the requisite findings for those listings or other manifestations including, but not limited to, those listed in 14.11I resulting in significant, documented symptoms or signs of a mental impairment at a marked level.

(Tr. 20).

As to Listing 1.04, the ALJ again explicitly considered whether Kraft's impairment satisfied the Listing's requirements:

> The claimant's degenerative disk disease fails to meet or medically equal Listing 1.04 of the Appendix 1 impairments. The record fails to demonstrate a nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and positive straight leg raising. Furthermore, the record evidence fails to establish spinal arachnoiditis or lumbar spinal stenosis with pseudoclaudication. Accordingly, I find that the claimant's degenerative disk disease fails to meet or medically equal listing level severity.

(Tr. 20 (citations omitted)).

Additionally, State Agency physician Dr. Milagros Flores considered the relevant Listings, and found that Kraft's impairments did not meet or equal the requirements of either one, both initially and on reconsideration.  (Tr. 71, 82).  The ALJ noted that Dr. Flores has knowledge of Agency definitions and standards, and clearly considered Dr. Flores' evaluations and opinions, finding them to be "consistent with the objective evidence including multiple physical exams and imaging studies."  (Tr. 25).

Despite the foregoing, Kraft argues that, in conducting the Step Three analysis, the ALJ "cites no medical opinion(s) in support of her conclusion" and thus "the evaluation of either listing is not supported by substantial evidence such that 'it is impossible to determine' whether substantial evidence supports the listing determinations."  (Doc. #11 at 23 (citations omitted)).  Kraft's arguments lack merit.

12

While the ALJ did not reference Dr. Milagros Flores's specific finding that Kraft's impairments did not meet or equal the Listings' requirements, this does not mean that the ALJ failed to consider that finding, or that reversible error occurred. An "ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Kornecky*, 167 F. App'x at 508. Here, the doctor did, in fact, determine that Kraft failed to satisfy the relevant Listings (Tr. 71, 82), and the ALJ discussed the doctor's overall report in detail, noting that his findings were "consistent with the objective evidence including multiple physical exams and imaging studies,"[4] which evidence, as discussed below, the ALJ also thoroughly discussed in her decision. (Tr. 25).

It has been recognized that, "The Sixth Circuit has consistently rejected a heightened articulation standard, noting … that the ALJ is under no obligation to spell out 'every consideration that went into the step three determination' or 'the weight he gave each factor in his step three analysis,' or to discuss every single impairment." *Staggs v. Astrue*, 2011 WL 3444014, at *3 (M.D. Tenn. Aug. 8, 2011) (quoting *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)). The *Staggs* court further stated, "Nor is the procedure so legalistic that the requisite explanation and support must be located entirely within the section of the ALJ's decision devoted specifically to step three; the court in *Bledsoe* implicitly endorsed the practice of searching the ALJ's entire decision for statements supporting his step three analysis." *Staggs*, *supra*, at *3 (citing *Bledsoe*, *supra*, at 411); *see also Smith v. Comm'r of Soc. Sec.*, 2012 WL 4897364, at *6 (E.D. Mich. Sept. 14, 2012). In this case, as discussed below, the plain language of the ALJ's decision, read in its

---

[4] The ALJ did take exception with Dr. Milagros Flores's opinion in one respect, however that actually favored Kraft. The ALJ explained that whereas Dr. Milagros Flores found that Kraft could "perform postural occasionally," "new evidence received at the hearing level and new impairments indicate that [Kraft] requires a sit/stand option while working as well as the use of a cane to ambulate." (Tr. 25).

13

entirety, makes clear that the ALJ thoroughly considered and discussed the evidence supporting the Step Three finding, and that her conclusion at Step Three is supported by substantial evidence.

In his motion, Kraft asserts that the ALJ erred in finding that he does not meet or medically equal the requirements of Listings 14.11 and 1.04.  (Doc. #11 at 23-27).  Listing 14.11 contemplates certain enumerated manifestations of an HIV infection.  Kraft argues that two manifestations are applicable:

> A. Multicentric (not localized or unicentric) Castleman disease affecting multiple groups of lymph nodes or organs containing lymphoid tissue . . .
>
> [or]
>
> I. Repeated (as defined in 14.00I3) manifestations of HIV infection, including those listed in 14.11 A-H, but without the requisite findings for those listings (for example, Kaposi sarcoma not meeting the criteria in 14.11E), or other manifestations (including, but not limited to, cardiovascular disease (including myocarditis, pericardial effusion, pericarditis, endocarditis, or pulmonary arteritis), diarrhea, distal sensory polyneuropathy, glucose intolerance, gynecologic conditions (including cervical cancer or pelvic inflammatory disease, see 14.1400F7), hepatitis, HIV-associated dementia, immune reconstruction inflammatory syndrome (IRIS), infections (bacterial, fungal, parasitic, or viral), lipodystrophy (lipoatrophy or lipohypertrophy), malnutrition, muscle weakness, myositis, neurocognitive or other mental limitations not meeting the criteria in 12.00, oral hairy leukoplakia, osteoporosis, pancreatitis, peripheral neuropathy) resulting in significant, documented symptoms or signs (for example, but not limited to, fever, headaches, insomnia, involuntary weight loss, malaise, nausea, night sweats, pain, severe fatigue, or vomiting) and one of the following at the marked level:
>
> 1. Limitation of activities of daily living.
>
> 2. Limitation in maintaining social functioning.
>
> 3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. Pt. 404 Subpt. P, App'x 1, §14.11(A), (I).

Listing 1.04 contemplates, in relevant part, disorders of the spine, including degenerative disc disease, which result in compromise of a nerve root or the spinal cord with:

> Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.[5]

20 C.F.R. Pt. 404, Subpt. P, App'x 1, §1.04(C).

Contrary to Kraft's argument, the ALJ explicitly and adequately considered these listings in her decision, concluding that Kraft fails to satisfy the criteria of either 14.11 or 1.04.  (Tr. 20).

With respect to Listing 14.11, Kraft does not point to any records indicating that he suffers from multicentric Castleman disease (Subpart A), and the ALJ specifically and appropriately found that the record "does not contain documentation" that would satisfy the other manifestation requirements identified by Kraft (Subpart I).  (Tr. 20).  As noted above, with respect to Subpart I, Kraft must show "repeated" manifestations of HIV infection, which means that "the manifestations occur on an average of three times a year, or once every 4 months, each last 2 weeks or more; or the manifestations do not last for 2 weeks but occur substantially more frequently than three times in a year or once every 4 months; or they occur less frequently than an average of 3 times a year or once every 4 months but last substantially longer than 2 week."  20 C.F.R. Part 404, Subpt. P, Appx. 1, § 14.00(I)(3).  While the manifestations can occur in any "combination," the Regulation makes clear that "You **must** have the required number of manifestations with the **frequency and duration required** in this section" to satisfy the Listing.  *Id.* (emphasis added).  Kraft makes no attempt to show that he satisfies the frequency or duration requirements, and instead simply argues that he has "had issues" with certain manifestations such as "infections," "muscle weakness," and

---

[5] The regulations provide that, "Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities."  20 C.F.R. Part 404, Subpt. P, App. 1 § 1.00(B)(2)(b)(1).

"peripheral neuropathy."  (Doc. #11 at 24).  Here, a review of the record shows that the ALJ's finding is supported by substantial evidence.

Kraft was diagnosed HIV positive in June 2013.  (Tr. 69).  In early 2015, he reported he was "fine and doing ok" with "no side effects" to his HIV medication.  (Tr. 519).  In June 2015, the only plan for his HIV care was to continue taking his antiviral drugs.  (Tr. 431).  In September 2015, despite his HIV infection, he showed "stable immune function" and was "virologically suppressed" on his medication regimen.  (Tr. 533).  In September 2016, he presented for abscess pain, but there were "no other issues" including with respect to HIV.  (Tr. 685).  The ALJ noted these medical records in her opinion.  (Tr. 23-24).  Kraft does not point to any medical evidence tying his symptoms to HIV, nor does he meet his burden of showing that any of these symptoms met the Listing's frequency or durational requirements.  The ALJ also appropriately referenced that many of Kraft's physical examinations yielded normal findings, including normal musculoskeletal range of motion.  (Tr. 22, 422, 434-35, 543-44, 681-82, 809).  Given all of these facts, the ALJ's conclusion that Kraft does not meet Listing 14.11 is supported by substantial evidence.

With respect to Listing 1.04, the ALJ found that the record "fails to demonstrate a nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and positive straight leg raising (1.04A)" and that the record "fails to establish spinal arachnoiditis (1.04B) or lumbar spinal stenosis with pseudoclaudication (1.04C)."  (Tr. 20).  The ALJ also noted that Kraft's "degenerative disk disease fails to meet or medically equal listing level severity."  (*Id.*).

In his brief, Kraft does not point to any evidence establishing that he meets *all* of the elements of the Listing, though, as the ALJ appropriately found, he meets some of elements.

16

Indeed, as the ALJ recognized, a study of Kraft's lumbar spine in April 2013 showed multilevel spondylitic disease of the lumbar spine with stenosis and impingement on the existing L4-5 nerve roots.  (Tr. 22, 324-25.)   However, Kraft's spine showed no spinal canal stenosis on C2-C3, moderate stenosis on C3-C4, borderline mild stenosis suspected on C4-C5, and no stenosis on C5-C6, C6-C7, or C7-T1.  (*Id*.).  He also showed multilevel degenerative changes including "a few tiny disc protrusion and bulges." (Tr. 330).  In July 2014, his spinal stenosis was "stable."  (Tr. 603).  In January 2015, he denied back or neck pain/stiffness, and denied gait problems.  (Tr. 335). In July 2015, his provider found that "predental and prevertebral soft tissues are normal… alignment of cervical spine is normal with normal bone marrow signal… the cervical spinal cord is notably, remonstrated.  His mild myelomalacia at C3-4 which is similar to the prior examination, but markedly improved from the preoperative study.  The remainder of the visualized spinal cord is of normal signal." (Tr. 554).  An August 2015 examination note states, "conus medullaris is normal . . . alignment and bone marrow appearance of lumbar spine are normal . . . essential resolution of the previously visualized posterior, postsurgical seroma." (Tr. 554-55).  Further, the examination notes reference his T10-T11 "broad-based disc bulge but [also found] no significant canal or neural foraminal narrowing," and as to his L2-L3, "minimal worsening of the broad-based disc bulge [but] no significant canal narrowing." (Tr. 554-55).  The provider's overall impression notes state that the "T2 hyperintense cord signal at the C3-C4 level is improved," and that "[t]here has been improvement in the postoperative seroma and both the cervical and lumbar spine, with only minimal progression of lumbar degenerative change." (Tr. 555).  Moreover, the ALJ appropriately noted that Kraft's physical exams, including his musculoskeletal and neck range of motion, were often normal.  (Tr. 23-24, 422, 434-35, 543-44, 681-82, 809).  And, the ALJ evenly discussed the other evidence which would at least appear on its face to support Kraft, such as the

fact that he appeared at a doctor's appointment in a wheelchair and had also requested a scooter; in addition to noting that at least the scooter was at Kraft's own "request[]", the ALJ noted that a physical exam from the very next month showed that Kraft had "no evidence of edema, no pain at passive or active movements, normal deep tendon reflexes, and no evidence of reduced range of motion or inability to ambulate."  (Tr. 24, 536).  As discussed above, the law is clear that if the ALJ's decision is supported by substantial evidence, the Court must affirm it even if substantial evidence exists for a contrary conclusion.  *Cutlip*, 25 F.3d at 286; *Blakley*, 581 F.3d at 406.

Kraft also argues that he meets the portion of the Listing which requires pseudoclaudication.  (Doc. #11 at 26.)  Yet, there is no such finding in the medical record, and it is improper for either the ALJ or the Court to draw medical conclusions from the raw records.

In sum, the foregoing shows that the ALJ's conclusion that Kraft does not meet Listing 1.04 is supported by substantial evidence.

### 2.    The ALJ's RFC Finding is Supported by Substantial Evidence

Kraft also argues that the ALJ erred in finding that he retains the RFC to perform unskilled sedentary occupations with restrictions as follows: he can only occasionally climb ramps and stairs, as well as only occasionally balance and stoop, but never kneel, crouch and crawl and never climb ladders, ropes, or scaffolds.  He must be allowed a sit/stand option allowing a change in position every 15 minutes as needed and without disturbing the workplace.  Finally, he should be accommodated by allowing him to use an assistive device to ambulate. (Tr. 24-26).  In reaching this conclusion, the ALJ pointed to numerous facts contained in the record, all of which support the RFC and her conclusion that Kraft's limitations were not as disabling as he alleged.

For example, as to his gait, the ALJ noted that, while there was a gait disturbance at most clinical visits, he was found to retain a functional, if not always full and pain free, range of motion.

(Tr. 24).  His neurological status in terms of motor power, reflex activity, and sensation were largely intact, and his musculoskeletal and extremity reviews were free of deformity, clubbing, cyanosis, heat, discoloration, ulceration, diminished pulsation, or atrophic changes. (*Id*.).  As noted above, records frequently showed Kraft's musculoskeletal range of motion was normal.  Additionally, as noted above, *supra* at 13, the ALJ pointed out that Kraft underwent state agency evaluations and was found to be able to perform work at the sedentary exertional level, with certain additional limitations, such as lifting up to ten pounds occasionally, and sitting more than six hours of an eight-hour workday and standing and walking for "slightly less" than two hours.  (Tr. 25, 72-75, 83-85).  The RFC adopted by the ALJ was even more restrictive than what the state agency physician indicated.  *See supra* at 13, n. 4.

In the face of the ALJ's extensive RFC analysis, Kraft appears to present two challenges.  First, he asserts that the ALJ did "not acknowledge[] or properly address[]" his physical impairments, and did not comply with Social Security Ruling ("SSR") 96-8p's "Narrative Discussion Requirements."  (*Id.* at 27-28).  These arguments lack merit.

SSR 96-8p provides, in relevant part:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.

Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *7 (July 2, 1996) (footnote omitted).  The Sixth Circuit has held that an ALJ complies with this Ruling by "assessing each of [the] work-related limitations that were at issue."  *Winslow v. Comm'r of Soc. Sec.*, 566 F. App'x 418, 421 (6th Cir. 2014).  Here,

where the ALJ did just that, and where Kraft has not articulated exactly how the ALJ's RFC finding fails to comply with SSR 96-8p, this argument is without merit.

Second, Kraft asserts that the ALJ's RFC "does not accommodate the need to lie down (the only alleviating factor for the excruciating pain of the gluteal abscesses, which seem to last at least several days, on average. . .)" (Doc. #11 at 28). However the ALJ did consider Kraft's subjective testimony that he needs to lie down up to 75% of the day. (*Id*. at 22). The ALJ found that "these contentions lack support from the office visit notes or physical examinations and force me to consider that the claimant may have exaggerated symptoms. Multiple physical exams were wholly normal and there is no evidence (and much evidence to the contrary) of an impairment sufficiently severe as to interfere with the performance of at least sedentary work. (*Id*.). Accordingly, the ALJ did assess Kraft's subjective limitation of lying down, compared it to the objective medical evidence, and essentially made a credibility determination that finds support in the record.

As the Sixth Circuit has held, determinations of credibility related to subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'" *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Sec'y of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)). Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).

Here, the ALJ provided a detailed, thorough and fair discussion of the record evidence, and considered the impact of that evidence on Kraft's ability to perform work-related activities. The Court finds that the RFC analysis is supported by substantial evidence.

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

III.    **CONCLUSION**

For the foregoing reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **(Doc. #15)** be **GRANTED**, Kraft's Motion for Summary Judgment **(Doc. #11)** be **DENIED**, and the ALJ's decision be **AFFIRMED**.


Dated: May 22, 2019                          s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                             United States Magistrate Judge



**NOTICE TO THE PARTIES REGARDING OBJECTIONS**

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above.  *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise,

and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 22, 2019.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager